Docket numbers 20-3977 and 3978, E. Jean Carroll v. Donald J. Trump and the United States of America. I invite counsel to come forward and settle at the counsel table. Now, I understand that the sequence in which the parties would like to proceed with the oral argument would be Mr. Freeman first, followed by Ms. Haba, and then, of course, for the appellee, Mr. Matz. Is that correct, the sequence? Yes, Your Honor. Okay. And I understand, Mr. Freeman, you have asked to reserve two minutes for rebuttal. Yes, Your Honor. Thank you very much. And if you're ready, please proceed. Mr. Freeman, you're representing President Trump? I represent the Department of – I'm from the Department of Justice. I represent the United States of America. I get it. Thank you. That was the first thing I was going to say. May it please the Court, I'm Mark Freeman from the Department of Justice on behalf of the United States of America. The former president made crude and offensive comments in response to the very serious accusations of sexual assault made by Ms. Carroll. I'm not here to defend or justify those comments. I'm here because any president facing a public accusation of this kind, which the media is very interested, would feel obliged to answer questions from the public, answer questions from the media. And as citizens – Can a president or a congressperson on the steps of the Capitol or in the White House say anything they want and be protected, as long as there's a reporter there listening? Is that the government's position? No, it's not the government's position, Your Honor, and we are not asking the Court to adopt any categorical rule here. What happened was, and what should have happened, is that the question whether the president was acting within the scope of his federal office should be assessed under D.C. law. Counsel, counsel, counsel. Yes. This is all very well. You're telling us this. I want to know what law decides whether it was in the scope of employment or not. And if, as I think probably is likely, but not that certain, I'll have more to say about that, it's the law of D.C. It isn't the law of the District of Columbia Circuit. It's the law of the District of Columbia itself. Agreed. And I'd like to know, because I didn't see in any of these briefs, but I've gone back and read all the law of the District of Columbia, what the District of Columbia has to say about this issue. Yes, let me address that. So, you're right that under the Federal Tort Claims Act, the applicable law is the law of the place where the act or omission occurs. The Supreme Court decided in the Richards case in the 1960s that that is the whole law, including the choice of law rules of that jurisdiction. So we apply here the choice of law rules of the District of Columbia. The District of Columbia analyzes choice of law on an issue-by-issue basis, including scope of employment. And the District of Columbia analyzes the scope of employment by looking to the law of the jurisdiction where the employment relationship exists. That's, here in our view, the District of Columbia. Yeah, this is why you were saying it is District of Columbia law. Correct. One can argue with that. My own feeling is it's probably correct. I'm not so sure about the initial starting point, rather than the law of the forum deciding that, despite Richards. But that's something that the parties agree to, so I'm not going to get into it. I don't need to. So, it is the District of Columbia deciding which law it is. And I think it's plausible on an issue-by-issue basis that it is therefore the law of the District. So what's the law of the District, then? So the law of the District, Your Honor, is, and we have in our briefs emphasized the D.C. Circuit cases that apply the District law. That's nonsense. That's nonsense. The District of Columbia Circuit, as D.C. has said, knows no more about the law of that than we necessarily know the law of New York. Of course. And they have said that. So Bellinger, which is your main case, is a lovely case, but it is no more relevant, really, than Judge Tatel's opinion, that comes out the other way before. Because they are federal courts guessing as to the law of the states. I agree. And so I would point the Court in that event to the District of Columbia, D.C. Court of Appeals decision, called District of Columbia v. Jones, 2007, cited in our brief. That was a case about a defamation action against the mayor of D.C. And in that case, and that was a case, to be totally candid, where the Court was applying the absolute immunity rules of the District of Columbia, not squarely the scope of employment rules. That's right. But in that case, as the Court, I assume, knows, the Court cited to Bellinger as evidence of the correct application of D.C. law. They have also said, in Penn Central's case, they came out with a quite different way. So, let me just be very blunt. Yes. Why shouldn't we simply do what we do in these cases, certify the question to the District of Columbia? So, I don't think that's necessary. I agree it's within the Court's power. If you'll let me explain why I don't think it's necessary. I think every Court that has addressed the understanding of the District of Columbia local law of agency, its application of the restatement to public officials, has come to the same conclusion. And plaintiffs don't point to anything that goes the other way. That is that it is part of the responsibility of a public official to address matters of grave interest to the public and the electorate. The problem with this is that while the parties both sort of say the law of New York and the law of the District are the same, the laws of New York and the law of the District are actually quite different. Because the whole question of whether it is necessary, whether the whole point is internalization as one set of cases do, or whether the point instead is, is it in the interest of the employer when the defendant is doing that, goes back to the essence of tort law, the difference between an action and the case of the action in trespass. And the restatement and D.C. are different in that from New York. On the other hand, D.C. has cited Harper and James, which is all internalization. All internalization, I know, because Harper and James took from me. You know, I'm there. Yes, sir. In that situation, do we have any idea of what either New York or D.C. would do in a case where saying that it is within the scope of employment has the effect of externalizing? Because of a totally separate fact that the Federal Torts Claims Act doesn't guarantee immunity. They might say, this is fine, but we don't have any cases. Tell us. If I understand Your Honor's question correctly, and I may not, so let me see if I understand it. If I understand Your Honor's question correctly, does the jurisdiction analyze scope of employment differently because the consequence of finding within scope would be under cases like Smith and so on, the application of a FPCA exception which would mean the plaintiff loses. And if I'm understanding the question correctly, I think the answer is that we can't look to the downstream consequences under federal law in analyzing the question Congress directed us to ask under local law. Congress pointed to… But it is up to local law to decide. So that if a local law wants to make a broad notion of scope of employment because that internalizes costs, the local court may well not want to do that where it doesn't. And the fact that that's a perfectly good thing from the standpoint of federal law doesn't bind them. Well, I have a couple of reactions to that. First, I think as a matter of federal law, the Supreme Court, and I see that I'm over my time. You know what, we're going to be very likely keeping all the parties up here beyond your red dot, so we'll tell you when to sit down. Since there's a question pending, if any of you have a question pending, please go ahead and answer it. Thank you. I have a couple of things that I may say in response to that concern. The first is the consequence recognized by the Supreme Court in Smith, and that was a textual analysis of the FPCA. It says that when the Westfall Act applies, the exceptions and exemptions apply. It has led already to other federal consequences, an interpretation of the FPCA, to avoid the outside, the negative consequences of plaintiffs. The most important of those, as you know, is the Gutierrez de Martinez case, which holds that you can have an appeal like this, that the attorney general's certification is judicially reviewable. And part of what the Supreme Court said in coming to that conclusion was you've got cases like Smith where the certification is the whole ballgame. That's why we ought to allow judicial review of that question. So I think the consideration you identified has already been accounted for on the federal side. But that says that because the issue ultimately, given this federal effect, is a state issue. And that's why it is appealable. If they wanted it to be only a federal issue, they would have decided those cases differently. But they said the issue is what in these circumstances does the state want to do? And, you know, nobody doubts that it's a matter of state law. Whether it's D.C. or New York may be in doubt, but nobody doubts it's an issue of state law. Respectfully, Your Honor, what the Act directs us to decide is whether the United States, if a private person, would be allowed to under state law. So I think the Act specifically instructs us not to ask what the consequences for the United States as an entity would be. The question that is a question of state law is how does the state read scope in all of the circumstances that are before it? Which involves that it is somebody that is doing something. Now, the matter would be easy if this were negligence because negligent acts have from the beginning in all of these states been read in terms of scope enormously broadly. And that would be so even if it were a negligent act which would not be give rise to federal government liability for whatever peculiar reason. But that isn't so with intentional torts, which is completely uncertain. But the District of Columbia, if I may, on that point, applies a very generous scope of employment law specifically as to intentional torts. The Ballenger case and the Woodrow case both cite District of Columbia decisions in which, for example... involved two employees who were entering the building at the Smithsonian and one employee assaults the other because she's offended that she was asked to show her ID. And there, the court held that there were issues of fact that you should be looking at, what the intent was. The moment the agent turns aside from the business of the principal and commits an independent trespass, then that might be not within the scope. How do you apply that case here? And earlier you said that the government doesn't suggest there's a categorical approach. Shouldn't we be parsing the individual comments and looking at whether they are serving the country or they're purely for personal purposes? Are there issues of fact here? I don't think there are issues of fact, but let me take the questions in reverse order, if I may. So, yes, we're not asking for a categorical rule. What we are asking is the correct application of D.C. law. D.C. is common among the parties. The D.C. law applies to restatement, multi-factor tests. In the Mahano case, as you mentioned, there was a violent attack. Under the restatement, the fourth prong of the restatement involves whether the use of violence, if it is a violent intentional tort, as opposed to, for example, defamation, whether the use of violence was predictable to the, foreseeable to the employer in the circumstance. Now, the court, even then, D.C. law is quite encompassing on intentional torts. There's the laundromat case. The case is different because it involves violence? A case can well be different. It would be context by context. Exactly. It is context by context. And that's why I keep being troubled, you know. I'm not interested whether this is President, former President Trump, or this is. I'm very interested in tort law. I'm aware of that, Your Honor. And because I'm very interested in tort law, I would like to know how the District of Columbia, which is the one that is deciding this context in context, would decide this particularly very interesting and difficult issue, which may get the District of Columbia into asking how outrageous or not, how much it is the sort of thing that is in employment, all sorts of things which, if they were to, if we certified and they were to deny certification, I would have to face. But that isn't really up to me to face. It's up to them to decide how relevant it is in the whole context, perhaps including in that context the fact that saying that it is within the scope externalizes costs, while the whole theme increasingly in the District of Columbia is to internalize costs. So, I have a couple of things, if I may, on that. As I've already said, and I'm happy to go into this, but I don't think that a state court can permissibly take into account the federal consequences in a particular case, because I think federal law speaks to that question, and Congress directed us what to happen if the United States were a private person. But I understand... Just to be clear, so I understand the point you're making. Yes. Because I think we're talking about the FTCA card out for slander defamation, right? Yes, that's a downstream exception, but I am... That's what I mean, when you're referencing the downstream effect, that's what we're talking about, right? Right. So, I take it that your theory would be, or your argument is, if for some reason Congress were to pass a law saying, well, we're changing that, we're abolishing that card out for torts that happened after a certain date, that there's no way in which the scope of employment analysis of the DC courts could permissibly or would be different for slanders before that date and after that date, and say, well, they're covered by the scope of employment when slanders are something you can't bring against the United States, but we're going to have a different scope of employment theory after that's abolished. What do you cite, Your Honor? What do you cite for that? I'm not aware of any case... What do you cite me for that very interesting proposition? I'm saying the statute, I don't have a case... No, the statute doesn't speak to that. The statute says that the government is liable when a private party is. The statute says, or the interpretation of the statute says, the federal government has not waived immunity in that. None of that says what a state might take into account. Let me give you a hypothetical. There is a state, we'll call it Calabresia, or Posenaria, which says, we define scope of employment entirely in terms of putting costs on this context, internalized. And therefore, for us, it makes all the difference whether this results in the loss being on the victim as against them on the injured. And that has nothing to do with whether there is immunity or whatever. We want costs internalized, and that's what is the essence of our scope of employment. Now, I'm not saying that that is the essence of DC's, I don't know. I understand. But where in federal law do you cite to me anything that says that Posenaria and Calabresia couldn't do that? This is a question that to my knowledge has not come up in any case, so I don't have a case to cite to you for that. What I can tell you, I think, is a couple of things. If you look at Smith, or Richards, or Martinez. Smith said that as far as federal law, as far as the Westfall Act is concerned, we don't take into account the fact of whether there is immunity or not. And that's a perfectly sensible thing that something should be asked and was answered. But it's a different question. But I think one would search the U.S. reports and the F-3rd and now F-4th in vain to find any federal court claims that case in which a court has backed the federal consequences of the Westfall Act. I don't believe the question was asked. Perhaps because neither lawyer nor court knew enough about tort law. But unfortunately for you, you have somebody who has spent 62 years teaching the subject. So, counsel, why don't we do this? We've kept you considerably past your time. You have reserved two minutes for rebuttal. We'll let you keep those. Why don't we move along then to Ms. Haba. You have ten minutes and you have reserved two minutes for rebuttal. Why don't we move along and, again, if we have additional questions for anybody, we're going to see you again in rebuttal. Thank you, Your Honor. May it please the Court. My name is Alina Haba and I represent the defendant, Appellant Donald John Trump, in this matter. I find it critical to address my client's position here, which is that he's not hiding behind the shield of the Westfall Act. This case, in his opinion, in my opinion, is meritless. What is of monumental importance right now is that this is not a political matter. This is not about being a Democrat or a Republican. It is solely to protect the presidency as an institution. And that is why I think this case is important. If affirmed, future presidents will be needlessly hindered by frivolous lawsuits. Americans need to feel secure. Well, counsel, can I ask you, when you say that about the institutional interests of the president, I think we all understand that whatever decision we make today would apply equally to all former, all future presidents. So I think we understand that. There are two questions, really. We focused our initial set of questions on the scope of employment question, which, as I think the discussion showed, involves certain choice of law questions, right? So the answer to the scope of employment question could vary in future cases, depending on where the alleged tort may occur, right? Or depending on what employee we have, if it's the president, whether it's always in D.C. or somewhere else, we don't know. We would have to decide a choice of law question somewhere. You would agree with that, right? I would. Future cases could hypothetically involve, I don't know, the law of Minnesota or wherever, right? We don't know. The president is golfing in Minnesota with the prime minister of France and negligently hits a ball that hits somebody. It's the law of Minnesota that decides scope of employment. Right? I don't know that I agree with that, Your Honor. All due respect, I think that the president is the leader of the country when he is sitting as the president. He is always in that position. So the protections that he's afforded, whether he's in Minnesota or whether he's in New York, or whether he's making a comment in the Oval Office as in New York. You are taking a categorical approach then. Whatever he does, whatever he says, it's an act of the United States. Is that the position? That is my position to some extent, and frankly, it has never been questioned until this point. In any event, you're suggesting that, again, to put it more technically, the second prong of our analysis, which is what law governs the scope of employment, if we get to step two, would always be the D.C. law. Is that your suggestion? Which is, of course, not federal law, but just because that would be the place where the employment contract exists. Yes, because the president worked in D.C. And obviously that would be a question for future courts whether that was correct or not in other circumstances. If we decided with you that this case was D.C., then we don't need to worry about it. Right. So I guess my point is, because that seems to be a question which could be of great importance in this case, in terms of whether D.C. law applies, and then what D.C. law means, right, not federal law. Could I direct your attention to the first question, which is also the subject of a lot of briefing, and strikes me as perhaps the one that is guaranteed to have a greater overall effect on, would always of necessity apply to a president's involvement in such a case, which would be, is the president, or a person who is then serving as president at the time of the alleged tort, covered by the Westfall Act to begin with? Yes, that's a resounding yes, Your Honor. Could you maybe address that for a minute? Of course. The first prong of the Westfall Act is to address whether the president is, in fact, a government employee that was meant to be protected, along with any other federal employees that were meant to be protected in this case. The answer is a resounding yes, absolutely. In Levin v. United States, the court tells that the Westfall Act applies to all federal employees. Gutierrez and Martinez, you know, they said the expenses definition in the Westfall Act is intended for the entire federal workforce. But it doesn't mean every single employee who receives a federal paycheck, right? There are inclusions, there are exclusions. It isn't literally every employee who receives a paycheck. No, Your Honor, but if you look at the Hatch Act, for instance, where it specifically excluded the president and vice president, that's a good example of why the definition section here in the Westfall Act was done intentionally. Any federal employee was interpreted to mean all federal employees when it comes to the Westfall Act. It was applied to... It was not a limiting word. The court below said it was a limiting word. You know, you could argue that either way. It does seem to me that at least it is ambiguous. And if you look at the legislative history, which you are allowed still to do despite things, the Westfall Act sounds as though this is broadly inclusive so that you can expand. So that looking at legislative history, including the use of the word executive branch, when they add expressly legislative branch and judicial branch, sounds in your favor. Yes, Your Honor. Actually, the legislative history demonstrated that Congress intended to include the president when it stated that the United States would also be able to continue to assert other functional immunities, such as presidential immunity. There is a question of whether the Westfall Act did amend the Federal Tort Claim Act, which is the one that defines employee, or whether it was an appropriate way of suggesting what it meant. My problem, actually, this will be with opposing sides, is that on the one hand they say that the fact that the Westfall Act added some specific ones suggests that the original word was limited. But that is immediately saying that the Westfall Act can be read to interpret the earlier one. And when you do that, it cuts your finger. Right. Well, to add to your point, Your Honor, which I think what you're discussing is the executive department versus the executive branch and that whole line of case law and legislative history on that. Wilson v. Lizzie, the D.C. Circuit Court of Appeals, upheld that the Westfall Act certification for the VP and three senior executive officials. Also, one was the White House Chief of Staff. That is the executive branch that is directly with the president. Mississippi v. Johnson, they said the president is the executive branch. He entirely holds that department branch. McNamara v. United States, FTCA held that it applied to all three branches. So even if you look at the FTCA and the original meaning, this was just an extension. This was not semantics, in my opinion. I do believe it included all three branches. And the president is part of the executive branch. It's the head of. Yeah. The principal argument, the opposite way. If we assume that it is ambiguous, the principal argument in favor is actually a case like the president golfing with the prime minister of France on official business, which in a negligence case is very broadly scoped, hits a ball, negligently hits somebody. It makes every sense in the world to say that the U.S. should pay for that rather than the president of the United States when he does that. That's the principal argument in favor. Principal argument the other way is the president is not somebody who is subject to anybody. And the idea of the Westphal Act was the government pays and then the government disciplines. And there's nobody to discipline the president. On the other hand, the Westphal Act adds judges and legislators and there's nobody to discipline us either. But those are the two. Your Honor, all due respect, I think the president can be disciplined. The president, you know, if you look at President Trump's history, he tends to be disciplined quite often. You know, this is truly, the president can be fired. He gets a paycheck. He is a government employee. He reports to things. There are checks and balances. That is how our history is. And to be clear on the fact that I don't know how much time I'm allotted. Why don't you go ahead and respond. Okay, thank you. But I do think that there is one distinction that I would like to make that is critical in this case. This is a negligence action. Ms. Carroll, she went to the press. She was a public figure. She went and put out an excerpt to the New York Magazine. Then she published a book. She made it public. She was on the aggressor side. At the time President Trump... I'm sorry, how is this, did you just say this is a negligence action? No. No, I said... You said, that's what you said. Oh, I did. I think you may have misspoken. Defamation. I'm sorry. I said this is a defamation. Defamation, I'm sorry. Thank you for correcting me, Your Honor. But this is defamation. This is not about the underlying alleged assault, which my client did not do. Even if that's all the case, I mean, who is he serving when he says something like, she's not my type? Is he serving the United States of America when he makes that statement? Absolutely, because he has to address the fact that this could not and would not have happened. He did not do it. It would have been one thing if he said, I didn't do it. But he goes way beyond that. You don't think so? At the end of the day, if he says, she's not my type... In the context of an alleged sexual assault, she's not my type. Quite honestly, Your Honor, it's content. It's content that you're discussing, not content. Was he sitting as the president when he made the comment that this didn't happen? Did he need to say it didn't happen? Absolutely. Did he need to say she's not my type? That is not really the critical question. Again, again, my problem is that you're discussing this with Judge Chin. And you could be discussing it with me. I don't know whether D.C. would say she's not my type is part of the job of president, or whether D.C. would say she's not my type is not. And I don't see any D.C. case. Leave aside the broader question that I raised, which got the U.S. Attorney all in the swivet. But leave that aside. It's up to D.C. Let me just follow on to Judge Kellip Raisi's question. Could you tell us your view, if you think it's settled under D.C. law, whether the precise content, for example, as Judge Chin is saying, the particulars of what were said, matter in this context for determining scope of employment, or it's rather just simply the context in which comments of some sort are made, regardless of whether they are defamatory or not. Sort of along the lines of you have the employees who, you know, you have the mattress delivery man who goes out, and he's supposed to deliver a mattress, and he winds up engaging in all sorts of horrible intentional torts like rape. Is your notion that even if someone engages in squarely personal defamatory statements, which let's hypothesize that these are squarely defamatory if given by a private citizen, is your theory that even if that's true, it doesn't matter because the context in which they were given, is that anything the President is saying is covered within the scope of his employment? And then I guess I'd like to know, what is your limiting principle, or is there no limiting principle? Is your theory that everything the President says, and I don't know, I guess I'll assume from the moment the President is sworn in until the moment the term of office expires, is your theory that everything the President says in any context, is within the scope of employment? For purposes of D.C. law, in terms of D.C. case law. This is not, I think what you're addressing is the idea that this is a slippery slope. Right, and what is the limiting principle in your view of what kinds of statements, let's just take this in baby steps, is it your view that everything a President says during their term of office is within the scope of employment as President? No. Okay, so what is the limiting principle you would propose under D.C. law, that you think is recognized by D.C. law? What is recognized by D.C. law in this exact specific case is Bellinger, is Libby, is the fact that he... Yes, Bellinger is not D.C. law. Bellinger is the D.C. circuit pontificating on D.C. law. My limit to you, Your Honor, in plain English, would be an unprovoked attack on a citizen. That is not what happened here. She put a statement in the press... Do you think the provocation, the test would be provocation? I think it is very important in this case to remember that Ms. Carroll... What D.C. case do you cite me for saying that provocation is even relevant? No, I think that he asked me what my opinion is. I don't have a D.C. rule. Well, no, it's a legal matter. I'm not asking you sort of what you feel. Right. When I say I'm asking you for your view as a litigant, what would you propose that we articulate is the limit that D.C. law, that we would ascertain from D.C. law, is the limit on what statements fall within and without the scope of employment. And I don't understand the provocation point. Whether it goes to the fitness of the president who is sitting running the country. And I think in this case it did. He had to address it. When the press, which is part of his job, asked him a question about a story which would go to his fitness to sit, whether it is pure or unsure, he needs to respond. Would you expect... Let me put it this way. That's an interesting argument that D.C. might buy. You know, it's a possible argument. It's an argument that if I were arguing before D.C. I would certainly make. I would say the reason that you say it is D.C. choice of law is because scope of employment, even if the tort occurred someplace else, employment is the issue and therefore it is D.C. law. And with respect to the president, anything that speaks to him is that. That's an interesting argument and maybe D.C. would buy it and maybe they wouldn't. Well, quite honestly, nobody has had to answer this question because it was applied five times prior and it was without question. Obama used it three times. Hillary Clinton used it to keep her private servers private. The fact that we're even here addressing this question in itself shows how established this is. And I appreciate trying to carve out and make new law, but this is done for a reason, so that a president can address concerns of the public. That is his job, to make this country feel secure. And when somebody says he did a heinous crime 20 years ago, he needs to address it. Look, to the extent that that is an appropriate federal question, then that should be addressed appropriately by a federal statute. But when the federal statute says, for whatever reason, correctly or incorrectly, we leave that up to the state, you can't make me an argument which says Congress should have said that this is not a state question. So maybe we've kept you all beyond your time. If there's anything you'd like to say wrapping up, we know you've reserved your minutes, but then we'll turn to you. So if you have any last concluding remarks. I think that the real reason we're here, and I appreciate your perspective on this, is that, in my opinion, the lower court, the district court, erred when they applied the Westfall Act. And it should definitely be overturned. Thank you. You've reserved two minutes for rebuttal. We appreciate that. And Mr. Matz, we'll hear from you now. Thank you, Your Honor. Can you hear me? Yes. But stand in between the microphones. That would be better. Okay. May it please the Court, my name is Joshua Matz. I represent plaintiff of Pele, E. Jean Carroll. For the reasons given in our brief, which I'd be happy to elaborate on, we do not believe Mr. Trump is covered by the FDCA. But I want to start by turning to the Court's questions concerning scope of employment, since that is the narrowest and clearest basis on which the decision below should be affirmed. Our argument here rests on three premises, which, with the Court's permission, I'll very simply state. The first premise really just goes to your questions, Judge Estella-Gracie and Judge Nardini. And the third premise really goes, I think, directly to Judge Kinn's questions. The first premise is that under FDCA law, which we're happy to accept for purposes of disappeal as a governing law, a person acts outside the scope of their employment if their conduct is too little actuated by a job-related purpose. In other words, if they act in furtherance of private motives, like revenge or retaliation. Second, in applying that standard, the Court accepts all of the allegations in the complaint as true, and bans all inferences in favor of Ms. Carroll. Wasn't that abrogated by Osborne? Respectfully, Your Honor, it wasn't. Osborne clarifies that there must be an ultimate factual determination, and that it's our burden to bear. But under cases like Stokes v. Cross and Jacobs, as well as this Court's Bellow decision, when the defendant and the United States make a decision not to introduce any evidence, and there is nothing in front of the Court other than the complaint, the allegations in the complaint are taken as true for purposes of the threshold determination. It's not really clear what else the Court could look to. There's nothing in front of that. But the allegations of a complaint cannot simply say, we allege that the President acted entirely out of personal pleasure. We agree. That would be conclusory. That's right. But if the D.C. Circuit accepts the restatement, which says that some personal may be okay, in fact, if this is in part to benefit the activity, then I don't see how you can say that what is alleged here gets us out of a situation where D.C. might say it is more one way than the other. That's why, you know, my problem is, again, now, then you have to ask, and this is where I get into the real trouble, that you have to ask, why are they asking about whether it benefits the activity or not? And then, if this has to do with internalization, then I get into real trouble. Yes, Your Honor. So if I may, I think what I'm going to try to establish is a legal point about D.C.'s scope of employment law, and then going to Judge Chin's questions, and this is going to be the third premise I wanted to emphasize, that the factual allegations here do support a conclusion under D.C. law that Mr. Trump acted for reasons that place him outside the scope of employment. And I do want to make sure that I emphasize those factual considerations, but first I'll start with the legal point. The position advanced by the President and the Department of Justice is a categorical position. They deny that it is, but they come up with basically no examples except this made-up provocation test that was not seen in the briefing or in any press event. The position that they would have this court adopt, and this is from the Justice Department's reply brief at page 18, is that the only question here is whether the general type of conduct is within the scope of the President's office. In the reply brief, DOJ principally smited Smith v. Clinton for that, which is a really good case for them, because there was no allegation of an improper purpose in that case, and therefore the court didn't consider the purpose standards. There is a wall of authority, however, holding that if a person is too little actuated, by a purpose to serve the master, that brings them outside the scope of the employment. And we know that the Justice Department knows this, because even as they're here telling you that's not the case, they're in D.C. telling a federal judge it is the case, in the case of Swalwell v. Trump, where they have argued that a member of Congress, Representative Mo Brooks, acted outside the scope of his employment on January 6th, specifically because he was not actuated by an appropriate purpose. And then there are additional cases. I would highlight D.C. v. Bamadel, which is a D.C. case, not a D.C. Circuit case, which says, at least where intentional torts are concerned, it is not enough that an employee's tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort. And so with respect to the question of whether acting with an improper purpose can remove you from the scope of employment, Ballenger says that, we think that's clearly settled under D.C. law, and that their categorical position can't be— and let me explain why as a matter of course principle it can't be right. If the restatement is clear that an improper purpose removes you from the scope of employment, I am unaware of the startling innovation in the law as a whole, that as a categorical matter, every official who engages in certain conduct necessarily acts with a specific individual subjective motivation. That is a classic factual determination that is traditionally entrusted to juries and to district courts. So are you saying that in every one of these cases, D.C. would require that there be an examination of the person's mind in order to determine whether it is within the scope of employment? That's a mighty broad statement. You know, I hear— It is a mighty broad statement. I hear what you say, that it is relevant, but the statement that that is enough, so that in every case, the District of Columbia would say, we must essentially send to a jury what was within this person's mind to say that it was within the scope. And if you do that, how do you—I'm sorry. That's in the restatement, right, which the D.C. cases rely on, that you look at the intent, at what the purpose is. Isn't that right? It is. Let me offer two very quick points in response to Judge Calabrese's question. The first is just a quote from Jacobs v. Robel. Quote, the focus of our analysis is on the state of the servant's mind. Armstrong v. Thompson, the key inquiry is the employee's intent at the moment the allegedly tortious conduct occurred. There are many cases that cite that proposition, and it's not the case that you always go to a jury. Courts are very familiar and have no shortage of tools to conclude that conduct was motivated by a purpose that is within the scope of employment. Wiltrick v. Murtha and Wilson v. Libby, I think, are good examples that are very different than this case. In both of those cases, the plaintiffs had alleged that high-level government officials acted with the intent of embarrassing another high-level government official. Let me tell you, and I'm afraid this gets me into tort things again, which is a problem. The whole notion of benefiting the employer as against your own aim comes from a tragic mistake done in 1900 when courts didn't know the origin between an action on the case and an action in prejudice. The world split into two sets of case laws. New York, which is essentially, is this part of the business, and a majority, including the restatement in D.C., which says it must benefit the person. And that's where intent comes in. The problem is that virtually all of these intent cases state, while they are saying that, have moved more and more and more in the direction of saying that what really matters to us is whether this is part of this job. You can just see that, and you can see it in D.C. citing Harper and James that they're moving in that direction. They are moving that way. How far that goes, I don't know, but I'm a little troubled just picking one language about intent and therefore not and saying that that is what governs D.C. today. And along those lines, since you have the trouble when you have cases that are D.C., I think, not D.C. Circuit, the guy who works at the laundromat who shoots somebody. I mean, you're not going to say that the laundromat owner actually derived a tangible benefit from having somebody shot. So doesn't that illustrate, I think, Judge Calabresi's point that the benefit of the employer or being actuated by the benefit of the employer is not quite as narrow as it might sound? You've got other courts, admittedly not D.C., but D.C. Circuit also, the example of the mattress delivery man, right? There's no way in which that sort of an intentional tort was good or that he was thinking, again, if you're trying to get subjectively into the mind of the tortfeasor, hey, this will be great for my boss. Nobody pretends that that's what the test means. And doesn't it mean, what Judge Calabresi is suggesting, it's drifted considerably, or maybe it never was what it was. The classic, the beginning cases, which went on one side of the line and the other were bill collector cases, where the bill collector beat up the debtor, and those were within the scope of employment or intentional. And rape cases, which people like me thought were terribly decided in 1900, where these were in department stores, women were being raped by informants, and the courts, the usual care of women at the time, said, not covered. That has changed so that in any number of cases, even involving things rather like rape, cases, they start doing dirty dancing analysis, it may be the benefit, all in order to internalize the cause. And, you know, realistically, that's what's going on, and that's how you have to read what these cases in DC are doing, and what that does to us today than in a case where the fact of saying it's within the scope of employment means that it is externalized. I have no idea. I think that raises, if I may, two quick points, and the second point I want to forecast is about the internalization point, but I'll make the first point first, which is it's true that in some of those cases, you're asking me about Weinberg versus Johnson, I believe the mattress case in DC, I believe that's the name of that, but it doesn't matter. The way that the courts reasoned about it is there, the altercation arose from an effort to sort of do the store's job, and so there was a sense that it was within the scope of employment, and I agree it's a broad view of what it means to be within the scope of employment. If you accept that, why couldn't you equally accept the rather expansive view, but it is a view put forth by the other side, that when you're the president, one thing you're constantly doing is fielding questions about your capability of fulfilling the office, and just as one might argue that someone might go dramatically beyond the bounds of, say, propriety in doing that, it's still functionally within the world of responding to claims you can't do your job, again, given the expansive nature of someone on a laundromat, presumably not supposed to be shooting people, but that's, as you're saying, was viewed by DC as somehow being within the scope of employment. So if I may, I'll address the internalization point quickly, and then come to your question, because they follow naturally on each other. So, Judge Calabrese, you've been asked before, DC law is about internalization in many ways, and the question you asked was, how would the DC court deal with the circumstance where a broad scope of employment denies a remedy, and the colloquy that the court had with opposing counsel... The opposite of all the cases it has dealt with. Exactly, and the colloquy the court had with opposing counsel was whether there was some issue with the absence of a federal remedy being uniquely problematic as a reason to treat state law differently. But what we don't actually know is how the DC courts would deal with the case where even as a matter of local law, there was no remedy. The DC courts have not articulated a respondeat superior doctrine for a circumstance where under either any body of law there's no remedy. So a certification could be appropriate for that reason, and I would highlight that. There may be, for instance, it may even be something as simple as a situation of whether they look at scope of employment differently when the employer is bankrupt and the employee is rich. Exactly. So the government would say that... And both cases occurred in a negligence context in Connecticut when the New Haven Railroad was constantly bankrupt and the engineers who were driving the trains were very rich, which is why the railroad was bankrupt. And, you know, does the local court look at that? We respect that would be an appropriate determination for the court in this circumstance to certify it to the DC court for that determination. But if the court doesn't do that, what I would emphasize is that it's true that in a number of cases, and this goes to Judge Harvey's question, and I think I want to try to get back to Judge Kinn's questions about the facts as well, it's true that DC courts have taken a broader view of what it means for a person to be pursuing a job-related purpose. But it's also true that those same courts, and here I'm looking at cases like Blair and Vanderdale and the whole line of cases that have been cited in the briefs, have emphasized that there are limits where a person seems to be acting in furtherance of personal animus or events or motivation, even if there is some connection to this work, sorry, to the job, where the job provides the opportunity for the commission of this work that the conduct is personal. Suppose the president is giving medals to people who were awarded medals somewhere, puts a medal on, puts a medal on, sees somebody who insulted him, and as he puts the medal on, he chokes him. He chokes him, and maybe kills him or not. Is that within the scope of employment or not? We would submit that if there were good reasons to believe that he had choked that person out of personal spite and malice, then yes, that would potentially bring the president outside the scope of employment. And this is where I think the facts matter in a case like this, because at this stage of proceedings, the allegations and the complaint have to be taken as true. And here's what that means. The court must accept as true, and by the way, it is true, that Mr. Trump raked my client, that he knew who she was when he did it, that he knew she was telling the truth when she came forward, and that he responded with his longstanding private modus operandi for destroying people who come forward to reveal his misconduct, and that his actions went way beyond a mere denial. Isn't it equally possible to view this, assuming all those things to be true, as saying, my God, if people think that the president did something like that, that makes the president incapable of doing his job, and so I have to lie and attack in order to protect the presidency. You know, the fact is that the president often has done things which goes beyond the law for purposes of the presidency. Almost every president has done it, and indeed, what is impeachable is when somebody like Mr. Nixon did something not for the presidency, but for his own benefit, but that's a mighty difficult thing. Your Honor, we agree. It's a line that will be violated in extreme circumstances. You don't have a problem. I assume you wouldn't have a problem if he had simply said, that's a false accusation. I didn't do it. We would not have a problem with that, Your Honor. So how do we figure out where there is a problem, particularly if he's making a series of statements one after the other? Do you really go through and say, this line is within the scope, the next line is not within the scope? Is that what a jury is expected to do? Your Honor, yes, and the inquiry, and to be clear, we're not asking for some innovation. It's really, my friends on the other side who are, this is classic respondeat superior doctrine. You look at the acts one at a time. The acts together may provide context and illuminate the meaning of each other. May I ask what your view would be on certifying this question of scope of employment to the District of Columbia? Your Honor, we would support the court making that judgment. We think it is ultimately a state law matter for determination. But in the event that the court doesn't do that, what we would highlight is, we must also always assume that the District of Columbia may wisely say, thank you, we don't want to take it. You decide it, and then we have to decide it. That is a possibility. Counsel, can we just go back to Judge Chin's question? I think a little, I would be interested in a little bit more follow-up there. I don't quite understand your position with respect to the hypothetical that Judge Chin posed, which is, let's suggest it was a more, it was a slightly different response, and the statement had been, that event never happened, or that accusation is false. How is that not equally defamatory? It may be equally defamatory. So you're just saying that it's just, because it's set in a calmer tone, it's somehow going to be viewed as not actuated by personal interest or not by an interest that diverges from that of the employer? Your Honor, no, that is not our submission. So how is this relevant? Just explain to me why there's a distinction legally between those two scenarios. Yes, because the question here is whether Mr. Trump acted in furtherance of private motives. And courts have identified many indicia of when a person appears to be acting in pursuit of private motives. So the tone, or the colorful nature of the language? But the substance is identical. We just heard that. The substance is identical. Your Honor, a mere denial is not the same as saying, I didn't rape her, and she's too unattractive for me to have done it, and by the way, she lied about other people doing it. Take the first part. Take the first part. Why is that not a mere denial? I don't understand the difference. Because it's our submission that a mere denial would not necessarily, would not standing alone be sufficient to cause a fact finder to conclude reasonably that the president would necessarily act in a private motive. Are you saying that the president, or anybody in such a situation, because this is voting for president, must do the minimal amount that is sufficient to preserve the office, and that anything beyond that is not covered? No. You're not saying that, because that's such a difficult line to draw. Because it seems like then you're suggesting the president of the United States is always going to be measuring their language every time they talk to wonder whether if they articulate their thinking just a little bit more, or if they lose their cool, or whatever it is, somehow that's the line between personal liability and not personal liability? With respect, Your Honor, I have two responses to that. The first is that there's nothing strange in our legal tradition about the idea that a person who says intemperate things that reveal an inappropriate motive could be held liable in circumstances where they wouldn't be if they hadn't revealed an improper motive. And the second point is that in this circumstance, in anticipation of the argument today I was thinking to myself, what would be a hypothetical I could use to describe a deliberate motive?  If the improper motive is defamation, that's achieved by simple denial. So I'm trying to think, what is the improper motivation? A non-work-related motivation? Is that the improper motivation? Yes. To be clear, we understand that the mere engaging in an intentional tort, in this case defamation, is not itself sufficient to conclude that a person acted with private motive. Right, because we know shooting somebody, the D.C. courts have told us, is not necessarily enough. Yes. So what is the line? I'm sorry, I'm just not following what you mean when you say improper purpose. With respect, I would resist Your Honor's suggestion that because the D.C. courts have said shooting somebody is not enough, then the door is off the hinges and anyone can do anything without a private motive. What I would say is that the courts have directed our attention to whether a person has acted with a private motive. So it's a private motive, not an improper purpose. Yes. The point I was making earlier in response, Your Honor, I took Your Honor, and I apologize if I was mistaken, I took Your Honor to be asking the question, how will we know, isn't it weird to ask whether the President's purpose was one that potentially creates liability or not? And what I was suggesting is, it's actually not weird. We do that in the law all the time. We look to circumstantial evidence in the conduct of a person to identify when they may have been acting with motives that potentially give rise to liability. And I guess that's what I'm asking is, what is the line in your view between proper and improper motives? That's what, I'm sorry, I'm just not understanding which line you're trying to draw. Maybe you can just explain that. Your Honor, I'm happy to try, but the line is, the way that the D.C. courts have described it, is that when a person acts in furtherance of personal retaliation or in vengeance or animus, that those are the kinds of motives, and I should say that very often occurs in cases involving sexual impropriety. I think part of the problem is that D.C. has clearly gone both ways. That there are cases in D.C. that suggest that somehow this is beyond the pale, and there are cases in D.C. that say this is not. And you're trying to give us a rationale for that that is in some way appealing, but which presents some problem for judging our deeming. My problem is that, you know, I can give any number of rationales. I am at a loss as to what is the actual today, because these things have been changing, what a D.C. court would say. And that would be as we submit a reason to certify, but on the assumption that the court may not choose that path, you know, I agree that this is not always the clearest test, that questions about private motivation can present challenges. But the fact that there may be hard cases doesn't mean that when there is an easier case, the court shouldn't apply the law as it stated. And that we submit that when Mr. Trump responded to Ms. Carroll's revelation of his sexual misconduct, by going out on public and repeatedly over the course of several days and quite vindictively, saying, essentially, she's not my type, she's too unattractive for me to have race. So you are saying that whatever that line is, a statement, she is not my type, she ain't pretty enough, or something like that, is not something that benefits the government, the premise, the presidency, and therefore is out wherever the line is. That's your, that's essentially your, your narrow argument has to be that we have to look at this and there is something said that is so clearly beyond that it doesn't fit. Well, if I agree with you, I agree with you, but I'm not sure I agree. We've kept you up past your time, and I appreciate that you've been answering our questions. Can I ask you to stick around a little bit more? Would you just address what I would call question one, which you might think of as a threshold question, but I suppose it depends on which order one thinks one ought to address these questions, which is about whether, in your view, explain why the president isn't covered by the West Wall Act to begin with. I think it would be useful for us to just hear your views on that. I appreciate that, Your Honor. With respect to whether the FTCA applies to the president, and I should highlight this, we're talking, we believe we're talking about the FTCA, not the West Wall Act, because the relevant definitional provisions were all written in 1946, and then some of them were amended in 1988. But back in 1946, looking at the statutory text, the first line is, the text makes no reference to the president. And as Judge Kaplan pointed out, you know, Congress doesn't ordinarily cover the president by the indirect implication of generic definitional terms. And if it were correct that that language covered the president by virtue of applying to anyone who draws a federal salary, then significant swaths of the original FTCA, and pretty much all of the amendments since then, would be rendered superfluous. And so it's our submission that when you look at that definition, it's using the word includes in a fairly irregular sense that is definitional rather than illustrative. And we would submit that's actually consistent with the original purpose and structure of the 1946 law. When the FTCA was enacted in 1946, it was not enacted as a benefit for federal officials. And my friends on the other side say, why would you deny the president the benefit of the statutory scheme? It became a benefit in 1988. But in 1946, it was a benefit for victims of torts. It was just another way that you could sue to try to obtain redress if you were injured at the hands of a federal employee. You were still free at the time to bring a private suit against them. But wouldn't you want, in the case, thinking about what Congress was thinking in 1946, wouldn't you want to say that if the president was golfing on official business with the prime minister of France, then negligently hit a ball that hit somebody, that this would be better placed in a suit against the government instead of against the president? In 1946, thinking about what they were trying to do to give relatively easy recoveries to victims who were injured by the negligence. A suit against the president would be a terribly messy business. It probably would have to be delayed four or five years until after he no longer, she no longer was president. A suit against the government would be the simplest thing in the world. So if that was the aim of the federal torts claimant, and we can read include one way or the other, isn't that a sensible way to read it? Your Honor, as a policy matter, with reference to my own policy preferences, that would be a reasonable way for Congress to have written the law. If it is clear that include is a narrow word, but if include is not, or can be read more broadly, and if what happens in 1988 can be taken as at least some judgment as to what was meant in 1946, then we can do it. Judge Kaplan said no, that's what the word means. And if that's what the word means, then so it is. I'm not so sure it means it does. If, I'm not sure there would be any spectators on the golf course anyway if the president were hitting the balls. But if secret service agents, well, they'd be covered by workers' comp or some version thereof, I suppose. But if the FTCA does not cover the president, would there be any remedy, or is it just too bad and sovereign immunity would bar him from claiming? I'll answer your question, then of course I would also answer Judge Kaplan's question. So in a circumstance where the FTCA doesn't apply to the president, the president would have the defense of absolute immunity from suit in that circumstance, and there probably wouldn't be a remedy to the plaintiff in the event that the absolute immunity... And it's unlikely to happen very often anyway, so that's something we, as a societal matter, we give up in return for the benefits of immunity, I suppose. Well, in 1946, when Congress passed the law, they weren't thinking as we are today about presidents on golf courses. They were thinking about U.S. Postal Service workers in cars hitting people. And, you know, to go back to Judge Talabresi's question about that, you know, I took the, you know, Your Honor, to be asking, well, if we could read it either way, doesn't it make more sense to read it as applying to the president? And let me just offer one reason to think it may not make that much more sense, one of which is the president already has ample immunities, although we realize that under Smith that's not conclusive. But the other reason is that if the FTCA, as enacted in 1946, applied to the president, what it would mean is that Congress had passed a law that created a new circumstance in which federal judges could sit in judgment and review of the conduct of the president in making that scope of employment determination, whereas they could have before. My golf course. The president is driving in his official car, there's a chauffeur, and he's going to an official meeting, so there's no doubt about it. And the president is in a hurry and says, speed. You know, go faster than, and somebody gets injured for that. Do we want the fact that did in 1946, given what they were trying to do about having making victims whole? Want to say that because the president himself might be, there might not be a suit against the federal government in that very much like a postman driving, which is the classic FTCA. Your Honor, I completely hear you as a policy matter, and I agree that providing redress is a good thing, but what I would note is that numerous courts interpreted the FTCA as not providing exactly that protection, for example, if Your Honor, if a judge, or if a member of Congress, or if a great many other persons who have federal salaries engaged in such conduct. That's right. And then in 1948, in 1988, the Westfall Act, it says, brings us in using language which they also suggest applies to a president when they say legislative branch, judicial branch, executive branch. Well, Your Honor, that's actually an important difference of opinion, I think. It doesn't say executive branch. Under the definition of federal agency, the 1988 law added the judicial and legislative branches. No, no, it's in the House report. Yes, Your Honor, and yes, we can read the House report for what it's worth, but at the same time, I would just highlight, I think that looking at the text, when a law refers to two branches of government, and it only refers to subsidiary components of the executive, and reading it as applying to the president would at least give rise to an additional new circumstance where courts could review the conduct of the president in office, you would expect something a bit clearer. And I think that was the basis of Judge Kaplan's reasoning, and that would be the basis on which the court were inclined to affirm on that ground it could. So we've kept you up here. Unless there are any further questions for the bench, maybe if you'd like to wrap it up with some final comments, and then we'll go to the rebuttal. I appreciate that. I just have a quick final comment on this, which is that with respect, just focusing on the scope of employment issue, we appreciate that D.C. law has read the scope of employment test broadly. But the D.C. courts have also made it clear that when a person acts with private motives, they're outside the scope of their employment. And if an elected official deliberately harms somebody, and does so for reasons that are private personal reasons as confirmed by the evidence in front of the court, denying a remedy in the name of the nation's sovereign immunity is at odds with the maxim that nobody is above the law. And we would simply submit that a White House job is not a promise of an unlimited prerogative to brutalize victims of prior wrongdoing through personally motivated attacks. That isn't the law. No court has ever said it's the law, and we would ask this court not to make it the law. Thank you very much. We're in order now. I think we'll hear from Mr. Freeman next for two minutes of rebuttal. And I think for rebuttal, because we've heard excellent arguments on both sides, we're going to keep the rebuttal to just about two minutes, please. Okay. Thank you, Your Honor. I'll get right to it. I'd like to start on the question where we ended about the first question, the textual issue about I think the argument comes down to whether including is a limiting question or an exclusive one. I'll just point you to the textual evidence on this. Before you get to the textual argument, the big picture argument, indeed the FTCA was passed to waive sovereign immunity so that victims could sue. And it is contemplating things like postal truck accidents and malpractice at a VA hospital. Did Congress really contemplate that it would apply to the President of the United States? You're right that it was the postal truck drivers that was the animus for the whole thing. But it says any employee of the government. We know that if a Supreme Court justice gets in a car accident on the way to work, that can be covered. And there's no reason to think that if the President of the United States got in a similar car accident, Congress wanted to relegate the President. The President's never going to be driving. Even the speeding example, streets are all clear. You're not going to have situations where the President is committing torts. Maybe, but then the discretionary function exemption gets in. It just doesn't seem likely. It doesn't make sense. Well, Congress said any employee of the government. And in the Westfall Act, the Supreme Court has described that as comprehensive. The word is inclusive. And if I can make a touchable point before I'm out of time, the definitional section 2671 says includes in chief places. But there's a third definition acting within the scope of employment for a military person. And that uses the word mean. That's a limiting word. And in just the position, includes is an open word. I'll also note that plaintiffs point to section 451 of Title 28 for the definition of executive department. That uses the word mean. So, in the Westfall Act, Congress was deliberately expansive and embracing. And it wanted to get every federal employee in all of the branches. The last question, I know I'm just at my buzzer, but if I can speak. Are you, excuse me, are you saying that the Westfall Act amended the Federal Tort Claims Act to include the President? No, no, Your Honor. What I'm saying is, I'm making the point, the observation you made before, which is the Westfall Act tells us what Congress meant by the phrase. That's always, you know. I appreciate it. It's a complicated argument about saying the latter law tells us what you're saying. Okay. And then I just, on the scope point, I think I heard my friend say that if the President of the United States had falsely denied, the former President just falsely denied the accusation of rape, that that would have been within scope. But here he went farther. And I think that gets us into very dangerous territory. And I think that's the merits of the defamation claim. I think once you agree that the President answering questions on this subject was within scope, he's within scope. And the merits of the defamation claim are what they are, but the scope of employment questions. Unless the outrageousness in D.C. defines the scope. And if I may, I know, Judge Calabrese, you've raised a couple questions about D.C. I understand your point that we don't know how D.C. would decide this exact case, but if I could take ten seconds to give you an argument about why they would decide it the way we think that they would. Ten seconds. Ten seconds. D.C. law applies to ask whether the general, this is the restatement, whether the general conduct at the time for which it is authorized and whether it's in the time and the place. Here the President is answering questions through White House press statements, sit-down interviews in the Oval Office, and answering questions from reporters on the South Lawn. Whatever else is within scope for the President, that's within scope. Okay. Thank you very much. Ms. Haba, you have two minutes, which we could also stretch by ten seconds. I appreciate it, Your Honor. First, I just want to correct one misstatement made by counsel for Ms. Carroll, that race is not the underlying allegations in this case. That is not what this is. This is a defamation case. I just have to put that back on the record. Race was what she alleged in her book. This is not a personal retaliation. And I do want to go to your point, which is that if we are to say that just because we don't like the way the President responds, what is the court going to do if Kyle Rittenhouse goes after President Biden for calling him a white supremacist? In that case, where there has been numerous press about defamation, is he to say that because he shouldn't have used those words, that the Westfall Act doesn't apply to President Biden? No, because they need to focus on their job. We are all imperfect people. But that is not what we're looking for from the President. He was, as my colleague said from the United States Department of Justice, he was a deputy White House press secretary comment. And what he said was not just she's not my type, which I think is very clearly him saying, I wouldn't have done this. This isn't me. I didn't do this. But also, he said he didn't want to diminish the severity of real assault. Nobody's talking about that part of his statement. It was published in the Federal Register. The other statement was on the way to Marine One, on the South Lawn, where the press was asking him a wide range of questions about Iran targeting a U.S. drone, an immigration issue. And then the press asked him about Ms. Carroll. Why? Because she made it a matter of public concern. He did not. The third part, he was responding to questions from a reporter during a 45-minute interview. They discussed the Federal Reserve, Supreme Court, Justice Kavanaugh, taxes and trade, election, President's authority to take military action against Iran. And then the reporter asked him about Ms. Carroll. I think that when we realize that he was on the defensive here, and that goes to where we say where is the limit. This is not a slippery slope. She made it public. And then when he addressed it and said, she's not my type. I wouldn't have done this. And don't say that, Ms. Carroll, because there are victims that have actually been assaulted, and it's not right. That's what he said. I don't see that. I don't think so, Your Honor. I think I'm directly on point with the fact that this is within the scope of his employment. He's talking to the press about numerous things, and this was put in the press as per view by Ms. Carroll. So then she responds and says, I didn't do it. And she says, oh, I'm suing you for defamation. So you are saying that in effect, D.C. courts would make the merits issue be the issue as to scope of employment in a great particular. That may be, but I'd like to see it there. I think we have everyone's argument. We want to thank everyone for very helpful arguments today. Excellent. Excellent arguments on both sides. Thank you. And as with all the cases today, we're taking them under advisement. We also have a couple motions on the calendar. We reserve decision on those as well. And with that, I would ask the courtroom deputy to please adjourn. Court is adjourned.